HTSUS, and shall refund all excess duties with interest as provided by law.

MAGNESIUM CORPORATION OF AMERICA, et al., Plaintiffs,

v.

UNITED STATES, Defendant,

and

JSC Avisma Titanium–Magnesium Works, et al., Defendant–Intervenors.

Slip Op. 96–148.
Court No. 95–06–00789.

United States Court of International Trade.

Aug. 27, 1996.

Charles M. Darling, IV, William D. Kramer, Gregory D. Shorin, Clifford E. Stevens, Jr. (Baker & Botts, L.L.P.), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Jeffrey M. Telep, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Robert J. Heilferty, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for defendant.

John D. Greenwald (Wilmer, Cutler & Pickering), Washington, DC, for defendant-intervenors Avisma Titanium–Magnesium Works and Solikamsk Magnesium Works.

Margaret R. Polito, George W. Thompson (Neville, Peterson & Williams), New York City, for defendant-intervenor Hunter Douglas Metals.

Frederick P. Waite, Denise Cheung (Popham, Haik, Schnobrich & Kaufman, Ltd.), Washington, DC, for defendant-intervenors Gerald Metals, Inc., Greenwich Metals, Inc., and Hochschild Partners.

***OPINION***

POGUE, Judge:

This case is before the Court on a motion for judgment upon the agency record pursuant to USCIT R. 56.2. Plaintiffs, Magnesium Corporation of America, International Union of Operating Engineers, Local 564, and United Steelworkers of America, Local 8319 ("Plaintiffs") bring this action under section 516A of the Tariff Act of 1930 for review of the final affirmative determination of the International Trade Administration of the United States Department of Commerce ("Commerce") that imports of pure magnesium from Russia are sold at less than fair value ("LTFV"). *Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium From the Russian Federation*, 60 Fed.Reg. 16,440 (March 30, 1995) (*"Final Determination"*).

**BACKGROUND**

On March 31, 1994, plaintiffs filed an antidumping petition alleging material injury by

reason of LTFV imports of pure and alloy magnesium from China, Russia and Ukraine.[1] Thereafter, Commerce initiated antidumping duty investigations. In June 1994 Commerce sent the antidumping questionnaire ("questionnaire") to Berezniki Titanium–Magnesium Works ("Avisma") and Solikamsk Magnesium Works ("Solikamsk") in Russia. Commerce subsequently requested information from 56 potential exporters of Russian magnesium.

On October 27, 1994, Commerce issued preliminary determination that imports of magnesium from Russia were being sold at less than fair value [2] within the meaning of section 733(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673b(b) (1988).[3]

On March 30, 1995, Commerce published its final determination of LTFV sales for imports of magnesium from Russia.[4] Commerce reaffirmed its conclusion in the preliminary determination that Russia is a nonmarket economy country ("NME"). Commerce determined that Avisma did not make direct exports of magnesium to the United States during the period of investigation ("POI"), and that Solikamsk did make direct exports and qualified for a separate rate, which Commerce set at zero. Certain reseller/exporters, i.e. AIOC Corpo-

ration ("AIOC"), Gerald Metals, Inc. ("Gerald Metals"), Greenwich Metals ("Greenwich"), Hunter Douglas Metals ("HDM"), Hochschild Partners ("Hochschild"), Interlink Metals and Chemicals, S.A. ("Interlink"), MG Metals ("MG"), and Razno–Alloys, Ltd. ("Razno"), received zero or *de minimis* dumping margins. Commerce also established a 100.25 percent "All Others" rate based on best information available ("BIA"), which applied to all exporters not assigned an individual rate. This rate would also apply to reseller/exporters which received an individual rate, if they were to sell magnesium produced by a Russian producer different from the producer from which they exported magnesium to the United States during the POI.

Commerce issued its Antidumping Duty Order, together with an Amended Final Determination on May 8, 1995.[5]

In the related proceeding before the International Trade Commission ("Commission"), the Commission determined that the domestic industry was materially injured by reason of imports of pure magnesium from China, Russia and Ukraine.[6]

This action presents the following issues:

---

1. On June 22, 1994, The Dow Chemical Company ("Dow") joined the petitioners.

2. *Notice of Preliminary Determinations of Sales at Less Than Fair Value and Postponement of Final Determinations: Pure and Alloy Magnesium From the Russian Federation,* 59 Fed.Reg. 55,427 (1994) *("Preliminary Determination").*

3. Section 731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b (1988). The Uruguay Round Agreement Act ("URAA"), Pub.L. No. 103–465, tit. II, 108 Stat. 4809, 4842 (1994), amended the antidumping laws. These amendments, however, do not apply to investigations initiated before January 1, 1995, *id.* at § 291(a)(2), (b), which are thus regulated by the pre-existing law. Accordingly, this Court refers to the antidumping statute in effect prior to January 1, 1995. For simplicity, the Court speaks in the present tense when referring to the pre-existing statute.

4. *Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium from Ukraine,* 60 Fed.Reg. 16,432 (March 30, 1995) *("Final Ukraine Determination"); Notice of Final Determinations of Sales at Less Than Fair Value: Pure*

*Magnesium and Alloy Magnesium From the People's Republic of China,* 60 Fed.Reg. 16,437 (March 30, 1995) *("Final China Determination"); Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium From the Russian Federation,* 60 Fed.Reg. 16,440 (March 30, 1995) *("Final Russia Determination").*

Commerce assigned margins ranging from 79.87 to 104.27 percent to subject imports from Ukraine, from zero to 100.25 percent to subject imports from Russia, and 108.26 percent to subject imports from China. *Final Russia Determination* at 16,449–50.

5. *Notice of Antidumping Duty Orders: Pure Magnesium From the People's Republic of China, the Russian Federation and Ukraine; Notice of Amended Final Determination of Sales at Less Than Fair Value: Antidumping Duty Order Investigation of Pure Magnesium from the Russian Federation,* 60 Fed.Reg. 25,691 (1995).

6. *Magnesium from China, Russia, and Ukraine,* 60 Fed.Reg. 26,456–57 (Int'l Trade Comm'n, May 17, 1995) (final).

1. Whether Commerce's use of Brazilian raw dolomite to establish a surrogate value for concentrated carnallite rather than for raw carnallite is supported by substantial evidence, and otherwise in accordance with law?

2. (a) Whether Commerce's calculation of the surrogate value for electricity used in the production of magnesium is supported by substantial evidence, and otherwise in accordance with law?

(b) Whether Commerce violated plaintiffs' due process rights when it relied on an outside expert's consultation which plaintiffs could not review?

3. Whether Commerce's determination to value factory overhead costs using a Brazilian silicomanganese producer's factory overhead as a surrogate value, and without including an adjustment reflecting the electrolytic cell rebuild costs incurred by petitioner MagCorp, is based on substantial evidence, and otherwise in accordance with law?

4. Whether Commerce properly used a Brazilian surrogate value to calculate the Russian producers' selling, general and administrative expenses ("SG & A")?

5. Whether Commerce's calculation of by-product credits to the Russian producers' cost of manufacturing magnesium without reducing the value of the by-product credits by the after separation processing costs is supported by substantial evidence, and otherwise in accordance with law?

6. Whether Commerce's reliance on sales information reported by Razno, Interlink and AIOC immediately prior to verification is consistent with existing Commerce precedent, supported by substantial evidence on the record, and otherwise in accordance with law?

7. Whether Commerce's exclusion of resellers' SG & A from the calculation of foreign market value ("FMV") is consistent with existing Commerce precedent, supported by substantial evidence, and otherwise in accordance with law?

8. (a) Whether Commerce's refusal to deduct from USP the export taxes paid by Russian producers to the Russian government is in accordance with law?

(b) Whether the exchange rate balancing requirement, to which Russian producers were subject, represents an implied export tax that should be deducted from USP?

## STANDARD OF REVIEW

The Court will uphold a Commission determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law...." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984). The court may not substitute its judgment for that of the agency. *See Matsushita*, 750 F.2d at 936. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted).

When Commerce's interpretation of the antidumping statute is challenged, this court applies the two step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984): Using the traditional tools of statutory construction the court ascertains whether congressional intent on the disputed issue is clear, and, if clear, the court applies the statute in the manner Congress intended, regardless of the agency's position.[7] If the

7. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) ("First, always, is the question whether Congress has directly spoken to the precise question at issue.

If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

statute is ambiguous, the court, rather than interpreting the statute anew and rendering its own interpretation, must defer to an administrative agency's "permissible construction of the statute,"[8] whether that construction manifests itself in the application of the statute, *see, e.g., Daewoo Electronics Co., Ltd. v. International Union of Electronic Elec., Technical, Salaried and Mach. Workers,* 6 F.3d 1511, 1516 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994), or in the promulgation of a regulation, *see, e.g., Smith Corona Group v. United States,* 1 Fed.Cir. (T) 130, 136, 713 F.2d 1568, 1575 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). This deference is at its greatest level on issues involving Commerce's technical expertise in interpreting the antidumping statute it administers. *Fujitsu General Ltd. v. United States,* 88 F.3d 1034, 1039 (Fed.Cir.1996).

### DISCUSSION

This case involves the review of Commerce's final determination in the investigation of exports of pure magnesium from the Russian Federation ("Russia") to the United States.[9] Commerce determined that Russia is a nonmarket economy ("NME").[10] The prices of the goods produced in an NME are subject to discrepancies which distort their value. Consequently, the antidumping statute provides that, in such cases, Commerce calculates the foreign market value ("FMV") of the merchandise "on the basis of the value of the factors of production utilized in pro-

ducing the merchandise...." 19 U.S.C. § 1677b(c) (1988).[11] Commerce utilizes, "to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

In their petition, plaintiffs proposed Brazil as the appropriate surrogate market economy for Russia.[12] Commerce selected Brazil because it "is the only country that produces magnesium and is comparable in terms of per capita GNP to Russia."[13] To determine the FMV of magnesium, Commerce calculated surrogate values for the factor-of-production inputs (including raw materials, labor, and energy) using the Brazilian magnesium industry. Commerce then multiplied these values by the quantities reported by the Russian producers and exporters.[14] A factory overhead figure was also included in the FMV calculation, and certain by-product offsets were granted against the cost of manufacturing. Finally, Commerce added an amount for general expenses and profit, the cost of containers and coverings, and other expenses incidental to the shipment of the merchandise to the United States.[15]

### 1. *Carnallite v. Dolomite*

■ Avisma and Solikamsk use concentrated carnallite as the basic feedstock in the production of magnesium.[16] In their anti-

---

**8.** *Id.* at 843, 104 S.Ct. at 2781–82 ("If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

**9.** *Final Determination of Sales at Less Than Fair Value: Pure Magnesium from the Russian Federation,* 60 Fed.Reg. 16,440 (1995) ("Final Determination"), Public Document ("Pub.Doc.") 347 (Administrative Record ("A.R.") Fiche No. 66 at 85).

**10.** *Final Determination,* 60 Fed.Reg. at 16,443. The determination remains in effect until revoked. 19 U.S.C. § 1677(18) (1988).

**11.** "[T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country...." 19 U.S.C. § 1677b(c)(1).

**12.** Antidumping Petition, Pub.Doc. 1 (A.R. Fiche No. 2 at 44).

**13.** Policy Office Memorandum (Oct. 21, 1994), Pub.Doc. 150 (A.R. Fiche No. 34 at 46).

**14.** *Final Determination,* 60 Fed.Reg. at 16,443.

**15.** *Id.*

**16.** Raw carnallite, a potassium-based material, is refined into concentrated carnallite, which is the feedstock for the electrolytic cells in which magnesium is produced.

dumping petition, plaintiffs were unable to determine a value for carnallite in Brazil, because the Brazilian magnesium industry utilizes dolomite instead of carnallite.[17] Plaintiff therefore proposed a price of raw dolomite as a good surrogate value for raw carnallite. In its final determination, Commerce used the price of raw dolomite in Brazil[18] as the surrogate value for concentrated carnallite, because it had no surrogate value information for concentrated carnallite, and because concentrated carnallite and raw dolomite have a comparable content of magnesium.[19]

Plaintiffs criticize Commerce's use of a raw material, raw dolomite, to value a processed material, concentrated carnallite. Plaintiffs do not challenge the use of raw dolomite as a surrogate value. However, plaintiffs argue that raw dolomite is similar to *raw* carnallite, whereas the value relevant to the factor-of-production calculation is *concentrated* carnallite. Therefore, plaintiffs contend, Com-

merce should have adjusted the value of raw dolomite by adding the processing costs incurred to convert raw carnallite into concentrated carnallite.[20] Plaintiffs claim that Commerce has usually allowed adjustments to surrogate country values when necessary to reach an accurate determination.[21]

■ Despite plaintiffs' claim, the administrative record does not indicate a surrogate value for concentrated carnallite, because this material is not used in Brazil, the surrogate country. Commerce's use of raw dolomite was reasonable because its magnesium content is comparable to that of concentrated carnallite. The statute permits Commerce the use of "comparable merchandise" for valuing a raw material input as a basis for foreign market value.[22] Moreover, it is reasonable to conclude that the cost associated with processing raw dolomite into a suitable feedstock is included in factory overhead for the Brazilian industry.[23] Commerce's deter-

17. Plaintiffs' Reply Brief at 65.

18. Commerce calculated raw dolomite at $6.75 per metric ton ("MT"), a price which plaintiffs provided. Letter from Baker & Botts L.L.P. (April 14, 1994), Pub.Doc. 5 (A.R. Fiche No. 8 at 1).

19. The magnesium content of raw dolomite is 50% greater than the magnesium content of raw carnallite. It takes 1.5 units of raw carnallite to produce 1 unit of concentrated carnallite. Letter from Baker & Botts, L.L.P., Exhibit 4 (January 13, 1995), Prop.Doc. 91 (A.R. Fiche No. 116 at 1).

20. In addition, plaintiffs contend that SG & A expenses, profit, and overhead expenses must also be added to input costs, because Russian magnesium producers purchase the carnallite from others.

21. Plaintiffs cite *Ferrovanadium from the Russian Federation*, 60 Fed.Reg. 27,957, 27,958 (May 26, 1995); *Tapered Roller Bearing from Romania*, 52 Fed.Reg. 17,433, 17,437 (1987).

22. 19 U.S.C. § 1677b(c)(2) provides:

If the administering authority finds that the available information is inadequate for purposes of determining the foreign market value of merchandise under paragraph (1), the administering authority shall determine the foreign market value on the basis of the price at which merchandise that is—

(A) comparable to the merchandise under investigation, and
(B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,
is sold in other countries, including the United States.

The legislative history indicates that *comparable* merchandise is "a broader category than the 'such or similar' merchandise comparison which is usually used." S.Rep. No. 71, 100th Cong., 1st Sess., at 106 (1987). Consequently, "comparability" as used in the surrogate methodology has a wider meaning than "comparability" as used in the production process, where the term implies that the surrogate merchandise could be *substituted* for concentrated carnallite. The foregoing analysis answers plaintiffs' contention that raw dolomite is not comparable to concentrated carnallite. (Plaintiffs' Memorandum at 95–99.)

23. The Court notes that the *significant processing costs required to convert raw carnallite into concentrated carnallite*, which plaintiffs are agitating for as a basis for their claimed adjustment, were directly contested by defendant-intervenors Avisma and Solikamsk. During the investigations, in fact, defendant-intervenors Avisma and Solikamsk noted that

[p]etitioners overstate that cost [of processing raw carnallite into carnallite concentrate] by citing the cost of producing artificial carnallite rather than the mechanical dressing of native carnallite. Even so, the process for producing artificial carnallite is a simple operation (as is

mination is therefore supported by substantial evidence on the record, and otherwise in accordance with law.

Plaintiffs argue at length that they placed evidence on the record describing the Soviet method for producing artificial carnallite from raw carnallite.[24] Based upon this information, plaintiffs claim that they

were able to estimate that the surrogate value for concentrated carnallite was $15.32 per MT for Avisma and $17.84 per MT for [Solikamsk]. The reasonableness of these calculations is shown by a commercial proposal by Silvinit, a Russian metals trade from whom [Solikamsk] purchased concentrated carnallite ... [which] states ... an export price of 22.59 per MT.[25]

The Court recognizes that in applying the factors of production methodology to a nonmarket economy country Commerce has discretion to take a combined approach and to consider actual costs paid by the NME producer for each factor of production, if Commerce finds that such actual costs represent the best information available. *Lasko Metal Products, Inc. v. United States*, 43 F.3d 1442, 1445–46 (Fed.Cir.1994). In the case of the Russian magnesium producers, the combined approach would allow Commerce to use the market cost of concentrated carnallite—if available and if verified as accurate. Commerce's regulations provide that, if such or similar merchandise is not produced in the surrogate country, Commerce "may calculate the foreign market value using constructed value based on factors of production incurred in the home market country ... if the Secretary obtains and verifies such information from the producer of the merchandise in the home market country." 19 C.F.R. § 353.52(c) (1995).

The producers of concentrated carnallite were not under investigation here because Russian magnesium producers purchase their concentrated carnallite from unrelated Russian suppliers.[26] Therefore, neither calculation nor verification was at issue in the proceeding.

Plaintiffs are not claiming that Commerce should account for the actual cost paid by the Russian producers to purchase concentrated carnallite. Rather, plaintiffs seek to calculate the value for concentrated carnallite partly based on the surrogate value of raw dolomite, and partly based on unverified information about the Soviet method of production. Such a methodology would calculate the surrogate value of concentrated carnallite by comingling the surrogate value for raw carnallite (the value of Brazilian raw dolomite) with *estimated* Russian costs related to converting raw carnallite into concentrated carnallite. In following this methodology, plaintiffs point to their own estimated Russian costs and claim that Commerce should make the appropriate adjustments which reflect such costs.

Plaintiffs' methodology is not codified anywhere in the statute, and would be an aberration within the factors-of-production methodology for an NME country.

## 2. *Electricity*

■ The magnesium production process is electricity intensive.[27] Commerce stated that it would prefer to use publicly available, published information ("PAPI") from Brazil in order to determine which surrogate value to

reflected in the 10 KwH of electricity that Petitioners' claims [sic] are required). Valuing the 10KwH factor cost ... "adding factory overhead (22 percent), SG & A (12 percent) and profit (8 percent) yields an additional carnallite concentrate cost of $0.36 per ton." Letter from Wilmer, Cutler & Pickering at 12 n. 8 (January 27, 1995), Pub.Doc. 281 (A.R. Fiche No. 57 at 12). Plaintiffs erroneously define this statement as an admission. (Plaintiff's Reply Brief at 67–68.)

24. Plaintiffs' Reply Brief at 65, referring to Petitioners' Supplemental Publicly Available, Pub-

lished Information ("PAPI") Submission at Exhibit 4A, Prop.Doc. 91 (A.R. Fiche No. 116 at 1).

25. *Id.* at 65–66, referring to Petitioners' Supplemental PAPI Submission at Exhibit 5, Prop.Doc. 91 (A.R. Fiche No. 116 at 1).

26. Avisma Sections C and D Response at D–3, Prop.Doc. 17 (A.R. Fiche No. 78 at 1); Solikamsk Sections C and D Response at D–3, Prop. Doc. 18 (A.R. Fiche No. 79 at 1).

27. This fact is undisputed.

use for electricity,[28] but such information was unavailable for purposes of its preliminary determination. Initially, therefore, Commerce used information gained from a staff-person at the U.S. Consulate in Belo Horizonte, Brazil.[29]

The surrogate value for electricity was calculated to be at $0.055 per kWh, a simple average of the reported $/kWh rates for industrial use in Brazil.[30] Commerce then requested that the parties provide factor price data.[31] The Russian respondents provided PAPI for Brazilian large industrial users, such as magnesium or aluminum producers.[32] Plaintiffs did not submit any PAPI data for electricity, but commented on Russian respondents' submissions.[33]

In its *Final Determination*, Commerce decided that the Brazilian "large industry user" rate should apply and that the value for electricity should therefore be $0.0235/kWh.[34] Commerce noted that the electricity consumption of Avisma and Solikamsk "was significantly higher than the minimum necessary to receive the lowest rate in Brazil." [35] Commerce also requested advice from a private firm, CSA Energy Consulting ("CSA"), on the relationship between rates and electricity consumption, and between electricity consumption and line tension.[36]

Upon learning that Commerce had consulted CSA, plaintiffs also contacted CSA and solicited its advice, providing it with a copy of the Brazilian tariff schedules.[37] Then, based on the results of their own consultation contained in a letter sent by another CSA official, Mr. Palermo, plaintiffs requested correction of ministerial errors allegedly contained in the final determination.[38] Commerce rejected plaintiffs' allegations.[39]

---

28. *Preliminary Determination*, 59 Fed.Reg. at 55,-430.

29. Preliminary Determination Calculation Memorandum, Pub.Doc. 163 at 3 (A.R. Fiche No. 37 at 1). Belo Horizonte is the city where Brasmag, Brazil's sole magnesium producer, is located.

30. *Id.*

31. Request for Factor Valuation Data (Dec. 5, 1994), Pub.Doc. 206 (A.R. Fiche No. 43 at 95).

32. Respondents' PAPI Submission, Pub.Doc. 263 (A.R. Fiche No. 54 at 1). Respondents submitted (1) electricity rates published in the *Diario Oficial* (Brazil's equivalent of the Federal Register); (2) the *Tariff Bulletin* published by the Ministry of Mines and Energy of Brazil, also containing the electricity rates provided by Electrobras, the Brazilian supplier; (3) the *American Metal Market*, which reported that Brazilian large producers of aluminum paid between $0.022 and $0.026 per kWh. *Id.* at 8–10.

33. Plaintiffs' Reply to PAPI Submission, Pub.Doc. 282 (A.R. Fiche No. 57 at 44). Plaintiffs submitted new information about electricity rates obtained from the U.S. Consulate in Belo Horizonte, Brazil, objecting that the submitted PAPI was not specific enough to value electricity. The Consulate reported that a local gold mining company paid $53.00/KWh, and that the same rate probably applied to Brasmag, the local magnesium producer. The Consulate also stated that CEMIG, the local electricity company, has only two rates, domestic and industrial. *Id.* at Annex B.

34. *Final Determination*, 60 Fed.Reg. at 16446.

35. *Id.* Commerce explained that the rate was the one applied to Brazilian companies within electricity-intensive industries similar to that of magnesium producers. Final Calculation Memorandum, Prop.Doc. 135 at 3 (A.R. Fiche No. 127 at 3).

36. Commerce's Final Calculation Memorandum reads:

> Ms. Lynda White, Manager with CSA Energy Consulting, explained to DOC official that kVA are [sic] kW are figures used to measure demand and are roughly equivalent. She also explained that periodic kWh use could be divided by the number of hours in the period to get an approximation of the kW capacity of a user. She indicated that a user with demand of around 20,000 kW would likely be charged the lowest rate that a utility offered, and that a rate of 230 kV seemed appropriate for such a user.
> *Id.*

37. Commerce had not provided CSA with the exact figures because of the proprietary nature of such information. (Defendant's Memorandum in Opposition to Plaintiffs' Motion at 11.)

38. Ministerial Error Allegation, Pub.Doc. 351 (A.R. Fiche No. 67 at 11). In its letter to plaintiffs, CSA declares that "the statement regarding the voltage level service [i.e., a rate of 230kV] would be taken as incorrectly quoted. [CSA] . . . had expected this phrase to be removed." Petitioners' Letter of April 10, Attachment 1, Prop. Doc. 137 (A.R. Fiche No. 128 at 17).

39. Ministerial Error Memorandum, Pub.Doc. 355 (A.R. Fiche No. 67 at 51).

Plaintiffs now contend that the Brazilian tariff schedules used by Commerce were not the tariffs of CEMIG (which supplies electricity to Brasmag, the local magnesium producer), which has only two rates, domestic and industrial. The tariffs used by Commerce, instead, reported customer rates varying according to the tension of the line, where the lowest rate of 2.3 cents per kWh corresponds to a tension line of 230kV. A line of 230kV, plaintiffs argue, is far more than Russian producers would need.[40] Plaintiffs refer to the consultation that *they* received from CSA, where Mr. Palermo indicated that "[a]n industrial customer with a peak load of about 20,000 kW would take service" on A3a or A4 rates, which are more expensive than the A1 rate.[41] All these errors were brought to Commerce's attention in the ministerial error submission.

Plaintiffs' alleged errors, however, are immaterial because Commerce did not rely on the CSA statement in making its final determination. Instead, Commerce relied on PAPI provided by the Russian respondents on Brazilian electricity rates;[42] this is Commerce's preferred methodology for valuing factors of production.[43] The record shows

that the production of aluminum is electricity intensive, and that in this regard the aluminum industry is comparable to the magnesium industry.[44] Based on the tariff schedules and an article from the "American Metal Market" which reported the electricity rates charged to the largest industrial producers of aluminum, Commerce averaged the A1 rate for each month during the POI, and determined the surrogate value for electricity to be $0.0234 per kWh.

The critical issue, however, is whether the magnesium industry requires enough electricity to qualify for the lowest rate, A1, as applied by Commerce. The record indicates that it does. Commerce asserts that it had verified that both Avisma and Solikamsk used very large amounts of electricity,[45] and that the electricity rate charged to Brazilian large users is the A1 rate. Electricity constitutes a large portion of the costs incurred in the production of magnesium. Based on the evidence on the record, it is reasonable to conclude that magnesium producers use electricity at the lowest rate available. Moreover, record evidence also shows that a planned magnesium investment in Brazil would have an energy line of 230kV.[46] Final-

40. Plaintiffs argue that all the evidence refers to aluminum producers, which on average use several times more electricity than Avisma or Solikamsk. Plaintiffs also contend that the record showed that the application of the lowest tariffs required a special deal, and that the only aluminum producer to receive the lowest rate was one who agreed to pay for two years in advance.

41. Petitioners' Letter (April 10, 1995), Attachment C, Prop.Doc. 137 (A.R. Fiche No. 128 at 17). Nevertheless, Mr. Palermo's views do not specifically refer to Brazil, and are limited to users with a *peak* 20,000 kWh demand, whereas Avisma and Solikamsk's *minimum* demand is 20,000 kWh.

42. Respondents' PAPI Submission, Pub.Doc. 263 (A.R. Fiche No. 54 at 1).

43. *See Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt–Weld Pipe Fittings From the People's Republic of China*, 57 Fed.Reg. 21,058, 21,062 (1982) (Comment 4). In this determination, Commerce articulated the reasons for preferring PAPI to information obtained from embassies and consulates. Commerce explained that the quality of data obtained from embassies and consulates was inconsistent, and a cause of difficulty in determining which was the most reliable. Moreover, the preference

given to PAPI increased the certainty and predictability of Commerce's valuations, limited unnecessary delays in the course of the investigations, and alleviated the burden on embassies and consulates caused by requests for data. *Id.*

44. In the absence of detailed data on the subject merchandise, Commerce can use data on "comparable merchandise." *See* S.Rep. No. 71, 100th Cong., 1st Sess., at 106 (1987). Plaintiffs themselves refer to and rely on the aluminum industry to value the factors of production. *See* Plaintiff's Factor Submission, Pub.Doc. 264 at 2 (A.R. Fiche No. 55 at 2) ("As indicated in the Department's Policy Memorandum, aluminum is the most comparable product to magnesium. Policy Memorandum at 2 .... According to MagCorp's product expert, the aluminum industry is the most comparable industry to the magnesium industry in terms of production processes, costs....").

45. Commerce reached this conclusion mainly considering Avisma and Solimansk's minimum peak demand.

46. Antidumping Petition, Volume II Constructed Value, Exhibit 5, Annex G at 1–3, Pub.Doc. 1 (A.R. Fiche No. 2).

ly, no evidence indicates that the lowest rate was normally granted only upon "special deals," as plaintiffs object.[47] Consequently, Commerce's determination is based on substantial evidence on the record.

■ Plaintiffs also claim that Commerce's use of CSA's consultation violated their due process rights, because they were not given any notice nor opportunity to comment.[48]

Commerce did not inform plaintiffs of its request to CSA and did not give plaintiffs any opportunity to review CSA's findings prior to the final determination. It is evident, though, that plaintiffs had been aware of the question submitted to CSA since January 13, 1995, when the Russian respondents submitted the PAPI of electricity rates in Brazil, and that plaintiffs had full opportunity to respond and contest the data.[49] Moreover, even though Commerce may seek corroboration from an outside expert on information already on the record, CSA's opinion was not material to the final decision. In fact, Commerce issued its final determination before receiving any response from CSA.

Thus, Commerce did not rely on CSA's consultation in its determination. Commerce, in fact, reported CSA's statement using a patently incorrect electrical terminology.[50] The Court is persuaded that such a statement could not possibly have been the basis of Commerce's decision without creating dramatic abnormalities within the decision itself. The decision contains no such abnormalities.

The cases cited by plaintiffs are inapposite. In *PPG Industries v. United States*, 13 CIT 183, 708 F.Supp. 1327 (1989), in particular, this court reviewed Commerce's attempt to include in the record a document containing information on which Commerce had relied and which formed the basis for the final decision. In the present case Commerce sought confirmation from an outside expert with regard to information already on the record. CSA's consultation, therefore, was immaterial to Commerce's determination. Commerce relied on its own expertise and reached the same conclusion based on evidence on the record.

The fact pattern of the present case is similar to that in *Timken v. United States*, 12 CIT 955, 699 F.Supp. 300 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990). In *Timken*, plaintiff claimed denial of due process alleging that it had not been provided with an opportunity to comment on a telex Commerce received eight days before publication of its final determination. The court rejected plaintiff's claim because record evidence showed plaintiff's full involvement in the investigation, where it "received and submitted data on contested matters, participated in public hearings, and filed briefs." *Id.* 699 F.Supp. at 309.[51] Similarly, this Court re-

---

**47.** Plaintiffs rely only on the 1987 Metals Week article which simply reports that in 1987 Brasmag, the Brazilian magnesium producer, "had not been granted *special concessions* similar to those enjoyed by aluminum producers *in the Amazon region.*" Plaintiffs' Reply to PAPI Submission, Pub.Doc. 282 at Annex 1 (A.R. Fiche No. 57 at 44) (emphasis provided).

**48.** Plaintiffs cite *Sigma Corp. v. United States*, 17 CIT 1288, 1304–05, 841 F.Supp. 1255, 1268 (1993) (holding that failure to give notice or opportunity for comment on a change in rates made between the preliminary and the final results amounts to violation of due process); *Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 243–44, 566 F.Supp. 1523, 1527–28 (1983) (holding that absence of notice that a ruling was under reconsideration, ruling that is subsequently reversed, denied plaintiff opportunity to comment, and constitutes deprivation of due process); *PPG Indus. v. United States*, 13 CIT 183, 190, 708 F.Supp. 1327, 1332 (1989) (holding that failure to give plaintiff notice and oppor-

tunity to comment on a document which Commerce sought to add to the record after its final determination, and on which it relied, could violate due process rights).

**49.** The Brazilian tariff schedules, and the applicability of the lowest A1 rate to Avisma and Solikamsk, were also discussed at the administrative hearing. Hearing Transcript, Pub.Doc. 326 at 72–75, 93–99 (A.R. Fiche No. 64 at 1).

**50.** See footnotes 36, 38.

**51.** *See also NTN Bearing Corp. v. United States*, 15 CIT 75, 83, 757 F.Supp. 1425, 1433 (1991) ("Plaintiffs' active participation in the hearing and submission of briefs on the issue ... as well as their repeated correspondence with the ITA on this issue, belie their claim that they were denied due process rights...."), *aff'd*, 972 F.2d 1355 (Fed.Cir.1992); *NAR S.p.A. v. United States*, 13 CIT 82, 91, 707 F.Supp. 553, 561 (1989) ("[A] plethora of communications took place between

jects plaintiffs' claim of violation of due process rights.

### 3. *Factory Overhead*

■ Factory overhead represents the indirect manufacturing costs that a company incurs. Included in factory overhead are costs such as depreciation, insurance, taxes, repairs and maintenance, supervisory salaries, manufacturing supplies, power, and indirect labor.[52] The value for factory overhead is generally calculated as a percentage of manufacturing costs.[53] For its calculation of factory overhead, Commerce relied on data taken from another antidumping investigation on a Brazilian silicomanganese producer, and calculated the surrogate value for factory overhead at a 22 percent rate.[54]

Plaintiffs indicate that the magnesium industry uses electrolytic cells which must be rebuilt every 450–600 days, whereas silicomanganese furnaces last five to seven years. Furthermore, plaintiffs assert that the electrolytic cells used to produce magnesium require continuous maintenance because of the nature of the materials employed, whereas silicomanganese furnaces require minimal repair costs.[55] Thus, plaintiffs contend that Commerce should have adjusted the factory overhead costs of silicomanganese producers upward in order to account for the higher costs in the production of magnesium. According to plaintiffs, absent any appropriate surrogate information on factory overhead in the Brazilian magnesium industry, Commerce should have used petitioners' experience to value the cell rebuild overhead costs, as it has done in similar circumstances in the past.[56] By adding MagCorp's electrolytic cell rebuild expense rate, plaintiffs claim, Commerce should have reached a total factory overhead rate that is far higher than 22 percent.

Commerce counters that the factors-of-production analysis is complex, especially when examining a particularly complicated production process like the one used in the magnesium industry.[57] Consistent with its usual practice,[58] Commerce rejected an "item-by-item evaluation of overhead components," and instead calculated factory overhead as a percentage of the total cost of manufacturing. Commerce maintains that no data were available on magnesium production in Brazil, so it resorted to the best

NAR and Commerce throughout the administrative proceedings, rendering suspect NAR's assertion that it did not understand or perceive the actions Commerce took.").

52. Charles T. Horngren & George Foster, *Cost Accounting, A Managerial Emphasis* 29 (Prentice–Hall, Inc., Englewood Cliffs, NJ) (6th ed. 1987); Wayne J. Morse & Harold P. Roth, *Cost Accounting: Processing, Evaluating, and Using Cost Data* 29 (Addison–Wesley Publishing Company) (Third ed. 1986).

53. *See, e.g., Final Determination of Sales at Less Than Fair Value: Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from Hungary,* 52 Fed.Reg. 17428, 17429 (May 8, 1987).

54. Prelim.Calc.Memorandum, Pub.Doc. 163 at 4 (A.R. Fiche No. 37 at 1). The factory overhead calculations did not include energy (electricity, heavy oil, natural gas), which was calculated separately. *Id.*

55. Letter from Baker & Botts, L.L.P. to Commerce (January 10, 1995), Neelameggham Affidavit at 2, Prop.Doc. 88 (A.R. Fiche No. 115 at 1).

56. Plaintiffs indicate that Commerce has routinely made adjustments to surrogate factory overhead rates, and has accordingly excluded or included inputs that have or have not already been calculated as separate factors. The determinations cited by the plaintiffs, however, report cases where Commerce adjusted surrogate country data to exclude indirect cost elements that the NME producer had already reported as *direct* costs. The adjustments, therefore, were warranted to avoid double-counting a production factor. Indeed, in this case Commerce excluded energy costs, which were accounted for separately, from the factory overhead percentage. Prelim.Calc.Memorandum, Pub.Doc. 163 at 4 (A.R. Fiche No. 37 at 1).

57. The complexity of this methodology was recognized by Congress, S.Rep. No. 71, 100th Cong., 1st Sess., at 106 (1987), and ratified by the courts which defined the statutory mandate given to Commerce to require a "reasonable, good faith effort to obtain information," *Timken Co. v. United States,* 16 CIT 142, 145, 788 F.Supp. 1216, 1219 (1992).

58. *See Final Determination of Sales At Less Than Fair Value: Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the Socialist Republic of Romania,* 52 Fed.Reg. 17,433, 17,436 (1987).

information publicly available on silicomanganese production in Brazil as surrogate value.[59]

Quite correctly, Commerce explained that "[f]actory overhead is a combination of elements, some of which may be more or less expensive depending on the product or even the company."[60] Factory overhead reported by MagCorp is composed of cell rebuilds, maintenance materials, plant supplies, depreciation, and other fixed overhead.[61] Factory overhead reported by the Brazilian silicomanganese producer, conversely, is composed of costs for labor, contractors, indirect materials, maintenance, rents, others, amortizations, insurance, depreciation, power-demand, and power-auxiliaries.[62] The discrepancy stems from different cost accounting methods rather than different overall factory overhead costs. Cost accounting is characterized by its multiple methodologies, which although different may all be appropriate.

The discrepancy in cost accounting methodologies for factory overhead determines the differences at issue here. Even if electrolytic cell rebuild costs in the magnesium industry are higher than the correspondent costs in the silicomanganese industry, there may be other costs in the silicomanganese industry factory overhead which are higher than in the magnesium industry.[63] This might result from the adoption of different, even though equally acceptable, accounting methodologies, which are inconsistent with one another (i.e., in the depreciation of fixed costs). There is no evidence on the record that MagCorp's method of allocating inventory better reflects the subject NME country realities or the experience of any Brazilian magnesium producer.

Commerce "utilize[d], to the extent possible, the prices or costs of factors of production in one ... market economy countr[y] ... at a level of economic development comparable to that of the nonmarket economy country."[64] Adhering to the statutory mandate, Commerce used factory overhead data taken from an investigation of a Brazilian silicomanganese producer,[65] because the Brazilian data were deemed to reflect an experience close to that of magnesium producers in the subject NME countries.[66] In addition, the Brazilian data offered the advantage of referring to the same period of investigation.

It is Commerce's standard practice to disregard petitioners' costs because they are not "an appropriate benchmark by which to test

59. Prelim.Calc.Memorandum, Pub.Doc. 163 at 4 (A.R. Fiche No. 37 at 1). These data offered the additional advantage of relating to the same POI of this case.

60. *Final Determination*, 60 Fed.Reg. at 16,447, Pub.Doc. 347 (A.R. Fiche No. 66 at 92). Plaintiffs claim that these arguments constitute mere speculations not based on any record evidence. The Court disagrees for the reasons explained in the opinion.

61. Letter from Baker & Botts, L.L.P. to Commerce (April 7, 1994) at Appendix A, Prop.Doc. 2 (A.R. Fiche No. 73 at 1).

62. Prelim.Calc.Memorandum, Exhibit E, Pub. Doc. 163 at 4 (A.R. Fiche No. 37 at 1).

63. Plaintiffs contend that Commerce did not point to evidence indicating that some of the elements in the silicomanganese factory overhead were actually more expensive than similar elements in the magnesium factory overhead, and that this circumstance was sufficient to offset the higher costs related to the electrolytic process. Absent any such indication, plaintiffs claim that Commerce should have considered rebuilding electrolytic cells as a capital cost, and as such

included it in the constructive value ("CV"). In fact, "[t]he factors of production utilized in producing merchandise include, but are not limited to— ... (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3) (1988). Plaintiffs' arguments ignore the fact that they, not Commerce, bear the burden to point to evidence indicating that Commerce's determination is unsupported by substantial evidence, or otherwise not in accordance with law.

64. 19 U.S.C. § 1677b(c)(4) (1988). *See also China National Metals & Minerals Import & Export Corp. et al. v. United States*, 11 CIT 859, 866, 674 F.Supp. 1482, 1488 (1987) (explaining that Commerce must reach "the best estimate of foreign market value in the country of export"), *quoting Chemical Products Corp. v. United States*, 10 CIT 626, 631, 645 F.Supp. 289, 293 (1986), *vacated*, 10 CIT 819, 651 F.Supp. 1449 (1986).

65. Congress did not request that Commerce verify the surrogate information. H.Rep. 576, 100th Cong.2d Sess. 590–91 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623–24.

66. 19 U.S.C. § 1677b(c)(1).

the accuracy of surrogate country values."[67] While in an extraordinary circumstance—such as an absolute lack of information—it would be appropriate for Commerce to refer to petitioners' data, plaintiffs have not demonstrated that such a circumstance exists in this case. Commerce may use considerable discretion in the evaluation of factors of production. *See Tehnoimportexport v. United States*, 16 CIT 13, 14, 783 F.Supp. 1401, 1404 (1992). Commerce's decision to rely on the factory overhead ratio of a Brazilian silicomanganese producer is therefore appropriate.

### 4. *SG & A*

Selling, General & Administrative Expenses ("SG & A") is a ratio of general expenses to the cost of manufacturing. Commerce used the information submitted in the antidumping investigation of *Silicomanganese from Brazil* to calculate a representative ratio of SG & A for a Brazilian silicomanganese producer.[68] From the silicomanganese producer's data, Commerce took the values within the field for general selling expenses ("GNAU"), and calculated an SG & A of 10 percent.

Plaintiffs contest the calculations because the line entitled "GNAU" includes general and administrative expenses but does not include selling expenses. Plaintiffs indicate that the field "TOTGENU," on the other hand, is more appropriate because it represents the *total* SG & A percentage (approx. 18 percent), which includes selling expenses.

Commerce acknowledges that the field GNAU used to calculate the surrogate value for SG & A does not include selling expenses. Commerce therefore requests a remand to correct its valuation of SG & A expenses for

the Russian producers, and indicates that on remand it will use the field "TOTGENU."

■ Defendant-intervenors Avisma and Solikamsk argue that if the court concludes that Commerce's calculations are not supported by substantial evidence then the data they placed on the record offer the best alternative. These data show SG & A rates between 11.8 and 13.6 percent.[69] Defendant-intervenors also object that plaintiffs' claim is raised here for the first time, and should therefore not be entertained.

Defendant-intervenors' objection has merit. Plaintiffs had full opportunity to point out the alleged errors contained in Commerce's preliminary determination, but they failed to do so. Since the preliminary investigation, Commerce has calculated the SG & A ratio using the financial data from the GNAU field rather than from the TOTGENU field. Normally, a plaintiff that did not exhaust its administrative remedies would be estopped from raising the claim before this court.[70] The Court, however, recognizes that Commerce has requested remand to correct its calculations of SG & A expenses.

Time and effort will be saved if the calculations challenged before the Court are what Commerce considers to be its true and accurate final results. Therefore, the Court remands to Commerce to recalculate the surrogate value for Russian producers' SG & A expenses because Commerce has admitted that its valuation is not supported by substantial evidence on the record. On remand, all the parties will be afforded the opportunity to review Commerce's proposed corrections, and to make comments on them. Therefore, at this time, the Court does not address the issue of SG & A.

**67.** *Final Determination*, 60 Fed.Reg. at 16,447. 19 U.S.C. § 1677b(c)(1) indicates that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(4) requires Commerce to "utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country."

**68.** Prelim.Calc.Memorandum, Pub.Doc. 163 at 4 (A.R. Fiche No. 37 at 4); Prop.Doc. 58 (A.R. Fiche No. 96 at 1); Silicomanganese Worksheet, Nonconfidential Appendix to Memorandum in Support of Plaintiffs' Motion For Judgment Upon The Agency Record, No. 19.

**69.** Respondents' Letter (January 27, 1995), Pub. Doc. 281 (A.R. Fiche No. 57 at 1).

**70.** 28 U.S.C. § 2637(d) (1994).

### 5. By–Product Credits

■ Chlorine and potassium chloride are by-products of the magnesium production process.[71] Since Avisma and Solikamsk either use or sell part of these by-products, Commerce computed by-product credits in the calculation of the FMV. In the preliminary determination, Commerce accounted for the by-products by subtracting their value from the surrogate value of the cost of materials. In its final determination, accepting plaintiffs' argument, Commerce "subtracted the total by-product cost [sic] from the cost of manufacture (sum of materials, labor, energy, and imputed factory overhead, or "COM")." [72] Deducting the by-product credits from the cost of manufacture rather than from the cost of materials increases the factory overhead amount,[73] because the factory overhead amount is calculated by multiplying a percentage by an amount which has not been reduced by the amount of the by-product credits. Commerce asserts that the increase in the amount of factory overhead reflects the by-product processing costs, thereby "eliminating the need for valuing any additional processing-related elements." [74]

Plaintiffs disagree. Under generally accepted accounting principles ("GAAP"), plaintiffs explain, the by-product processing costs should have been deducted from the by-product revenues. Plaintiffs demonstrate that domestic magnesium producers incur significant processing costs in order to render the by-products suitable for use or sale.[75] Plaintiffs argue that Commerce should have resorted to this information because respondents did not cooperate in furnishing their questionnaire answers. Plaintiffs also assert that Avisma, which uses some of its chlorine by-product to produce titanium sponge, had already claimed the same by-product credit for the same period in another antidumping investigation, *Titanium Sponge from the Soviet Union.*

The parties do not contest Commerce's finding that chlorine and potassium chloride are by-products of magnesium production. A by-product is qualified by its "overall ... insignificant [value] when compared to the relative value of the ... subject merchandise." [76] When accounting for by-products, Commerce usually subtracts the sales revenue (or the value of by-products recovered) from the production costs of the product under investigation.[77]

The antidumping statute provides that the foreign market value is determined on the

---

71. By-products, in general, have sales values which are minor compared to sales values of the main product. Horngren & Foster, *Cost Accounting* 478, 490.

72. Final Calc.Memorandum, Prop.Doc. 135 (A.R. Fiche No. 127 at 1).

73. *Id.* at Exhibit F.

74. *Final Determination,* 60 Fed.Reg. at 16,446.

75. According to plaintiffs' expert, Dr. Neelameggham, processing costs associated with chlorine and potassium chloride are substantial. Letter of Baker & Botts L.L.P. (December 5, 1994), Neelameggham's Affidavit, Prop.Doc. 71 at 2 (A.R. Fiche No. 105 at 1).

76. *Final Determination of Sales at Less Than Fair Value: Sebacic Acid from China,* 59 Fed.Reg. 28,053, 28,056 (May 31, 1994). *See also Notice of Final Determination of Sales at Less Than Fair Value: Silicomanganese from Venezuela,* 59 Fed. Reg. 55,436, 55,439 (November 7, 1994); *Final Determination of Less Than Fair Value Sales: Coumarin from China,* 59 Fed.Reg. 66,895, 66,-900–01 (December 28, 1994).

77. *See Final Determination of Sales at Less Than Fair Value: Sebacic Acid from China,* 59 Fed. Reg. 28,053, 28,056 (May 31, 1994); *Final Determination of Less Than Fair Value Sales: Coumarin from China,* 59 Fed.Reg. 66,895, 66,900–01 (December 28, 1994). In *Coumarin from China,* as in this case, Commerce initially accepted an offset to the cost of materials for by-product values, 59 Fed.Reg. at 66,897; however, in the final determination Commerce calculated the offset to the cost of manufacture, 59 Fed.Reg. at 66,901. *See also* Horngren & Foster, *Cost Accounting* 490–93.

*Cf.* this accounting methodology *with* that for co-products (also called joint products), which typically have relatively significant sales value. Horngren & Foster, *Cost Accounting* 478. For co-products, Commerce usually first deducts the after-separation costs from the sales revenues and then subtracts the sales revenue from the production costs. *See Notice of Final Determination of Sales at Less Than Fair Value: Silicomanganese from Venezuela,* 59 Fed.Reg. 55,436, 55,439 (November 7, 1994). This practice is consistent with generally accepted accounting principles. *See* Horngren & Foster, *Cost Accounting* 483–84.

basis of the factors-of-production methodology. 19 U.S.C. § 1677b(c)(1). The factors of production include, but are not limited to, labor, raw materials, energy and other utilities consumed, and capital cost. 19 U.S.C. § 1677b(c)(3). The statute also directs Commerce to add an amount for general expenses to the value of the factors of production. 19 U.S.C. § 1677b(c)(1). The cost of general expenses encompasses factory overhead. *IPSCO, Inc. v. United States,* 965 F.2d 1056, 1059 (Fed.Cir.1992) (discussing constructed value).[78]

Commerce allocated by-products processing costs to factory overhead.[79] Commerce determined that the increase in factory overhead was representative of the costs of processing the by-products,[80] and thus eliminated the need for calculating costs related to the by-product processing.[81] In addition, Commerce "adjusted the total by-product cost to reflect the actual purity concentration of the by-product in the production process."[82]

Commerce's methodology reflects a reasonable interpretation of the provisions for nonmarket economy countries, codified under 19 U.S.C. § 1677b(c), because it accounts for both the value of the by-products and the costs related to by-product processing. This methodology is reasonably based on substantial evidence in the administrative record. Commerce verified the indirect costs, including by-product processing costs, at the respondents' facilities in Russia.[83] The incidental nature of by-products and their insignificant value does not warrant costly accounting procedures.[84] This Court cannot substitute its own construction for the reasonable interpretation made by Commerce. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Fujitsu General Ltd. v. United States,* 88 F.3d 1034, 1039 (Fed.Cir.1996). Thus, Commerce's determination is sustained.

Finally, plaintiffs' contention that Avisma allegedly duplicated its by-product credits is immaterial to this action, because it is uncontroverted that Commerce has not granted any offset claim in the *titanium sponge* case. That case is not before the Court.

78. For nonmarket economy countries, the statute does not provide minimum values for general expenses in terms of percentages of costs, as it does for the calculation of constructed value. The factors-of-production methodology, provided for nonmarket economy countries, applies if Commerce cannot determine the foreign market value of the merchandise on the basis of sale price or constructed value. 19 U.S.C. § 1677b(a).

79. As noted before, Commerce accepted plaintiffs' argument that the by-product offset should apply to the COM of the merchandise rather than to the cost of materials. Final Calc.Memorandum, Prop.Doc. 135 (A.R. Fiche No. 127 at 1).

80. *Final Determination,* 60 Fed.Reg. at 16,446.

The Russian producers treated by-product processing costs as *indirect costs,* including them in factory overhead. Indirect labor and indirect material costs, e.g. for limestone and limemilk, were reported by respondents, and considered by Commerce in its calculations. *See, e.g.,* Commerce's Verification of Factors of Production and Sales of Solikamsk at 5 and 8, Prop.Doc. 117 (A.R. Fiche No. 121 at 13).

Plaintiffs assert that by-product costs are not included in the surrogate overhead percentage calculated by Commerce. Plaintiffs also claim that in another determination Commerce required respondents to subtract additional pro-

cessing costs from the gross revenues received for the sales. *See Silicomanganese from Venezuela,* 59 Fed.Reg. at 55,439. In *Silicomanganese from Venezuela,* however, the product considered was a *co-product,* which typically has relatively significant sales value. Moreover, the subject country was a market economy, in which case cost data are obviously more accurate.

81. Plaintiffs object that overhead expenses are unrelated to revenues from the sale of by-products. Subtracting by-product credits from COM does not include the by-product processing costs necessary to render the by-products *saleable.* Rather, plaintiffs claim, Commerce should have first deducted the by-product processing costs from the by-product values, and *then* deducted them from COM.

82. Final Calc. Memorandum, Prop.Doc. 135 (A.R. Fiche No. 127 at 1).

83. *Final Determination,* Appendix I, 60 Fed.Reg. at 16,450.

84. Horngren & Foster, *Cost Accounting* 491. Indeed, Avisma reported that the factory does not calculate by-product processing costs. Letter of Wilmer, Cutler & Pickering of October 11, 1994, submitting Avisma's response to Commerce's questionnaire, at 21, Prop.Doc. 40 (A.R. Fiche No. 88 at 21).

### 6. U.S. Sales

■ Razno–Alloys, Ltd. ("Razno"), AIOC Corporation ("AIOC"), and Interlink Metals and Chemicals, S.A. ("Interlink") are three of the trading companies that reported some of their U.S. sales of pure magnesium just prior to, or during, verification.[85]

At the start of the investigation, Razno reported one sale of magnesium directed to the United States, and declared that the major volume of sales during the POI was directed to " 'w/house [warehouse] Kotka and/or Loviisa and/or Rotterdam' and 'FOB Kotka'."[86] Subsequently, Razno submitted information on ten additional sales of stockpile magnesium.[87] Commerce verified Razno's sales documentation in Zurich, Switzerland, where the accounts and sales records were maintained,[88] and found that Razno had reported all of its sales made during the POI. Razno justified its initial omission of the ten sales by declaring that it was unaware that they were destined for the U.S. market.[89] Commerce verified Razno's claim and found no discrepancies.[90] However, Commerce's

examination of "Razno's sales ledgers and contract files revealed two POI U.S. sales . . . that had not been reported as POI sales to the United States,"[91] apparently because the final destination was not indicated in the invoice.[92]

Plaintiffs claim that the information which Razno failed to report was so significant that Commerce should have questioned the veracity of Razno's entire submission, and, in accordance with Commerce's common practice, resorted to total or partial best information available ("BIA") to calculate dumping margins.[93] Instead, plaintiffs argue, Commerce departed from its standard practice without any explanation.[94]

Plaintiffs also censure Commerce's treatment of late submissions from two other trade companies, AIOC and Interlink. During its verification, AIOC reported the existence of a purchase contract which had not been included in its response to Commerce's questionnaire.[95] Twenty-one sales were connected to this purchase contract, and were

---

**85.** Verification includes Commerce's visit "with producers or resellers in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 353.36(c) (1995).

**86.** Razno's Letter, Pub.Doc. 74 (A.R. Fiche No. 17 at 7).

**87.** Letter of Wilmer, Cutler & Pickering (October 26, 1994), Pub.Doc. 159 (A.R. Fiche No. 36 at 16). Stockpile magnesium is presumed to have been all channeled into the U.S. market. *See* Razno Verification Report at 2, Prop.Doc. 97 (A.R. Fiche No. 120 at 2).

**88.** Razno Verification Report, Prop.Doc. 97 (A.R. Fiche No. 120 at 1).

**89.** *Id.* at 3.

**90.** *Id.*

**91.** *Id.*

**92.** Razno Verification Exhibit 4 (A.R. Fiche No. 140 at 1, 25, 29).

**93.** Plaintiffs also point out that numerous documents establish the existence of another U.S. sale during the POI. Amalgamet Verification Exhibit 9, Prop.Doc. 115 (A.R. Fiche No. 120 at 93; Fiche 177 at 46). Nevertheless, these documents refer to sales of different quantities of magnesi-

um for which there is no evidence that the destination was the United States.

**94.** Plaintiffs rely on *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (holding that an agency abuses its discretion by not offering adequate explanation for its failure to follow its own precedent); *Hussey Copper, Ltd. v. United States*, 17 CIT 993, 834 F.Supp. 413, 418 (1993) ("It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure. . . .' ") (quoting *Citrosuco Paulista*, 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988)); *National Knitwear & Sportswear Ass'n v. United States*, 15 CIT 548, 553, 779 F.Supp. 1364, 1369 (1991) ("When an agency relies on its methodologies and procedures, it 'must either follow its existing precedents or provide a reasonable explanation for its deviation or noncompliance.' ") (quoting *Western Conference of Teamsters v. Brock*, 13 CIT 169, 181, 709 F.Supp. 1159, 1169–70 (1989) and *ILWU Local 142 v. Donovan*, 9 CIT 620, 625, 1985 WL 6154 (1985)).

**95.** Letter from AIOC (December 15, 1994), Prop.Doc. 73 (A.R. Fiche No. 105 at 34). AIOC's verification was conducted on December 15–16, 1994 and February 8–9, 1995, at AIOC's headquarters in New York, NY. AIOC Verification Report, Prop.Doc. 122 (A.R. Fiche No. 121 at 61).

subsequently verified by Commerce.[96] Similarly, during verification Interlink provided Commerce with information about a number of sales not included in its questionnaire response, thereby increasing the total quantity of magnesium related to its sales.[97] Commerce examined logbooks and all sales contracts filed within the POI, noting no evidence of unreported sales to the U.S.[98]

Plaintiffs claim that Commerce should have rejected AIOC and Interlink's sales submissions as untimely, and used BIA instead, or explained its diversion from its standard practice.

The antidumping statute requires Commerce to use BIA whenever Commerce is "unable to verify the accuracy of the information submitted."[99] Verification includes "access to all files, records, and personnel of the producers, resellers, importers, or unrelated purchasers which the Secretary considers relevant to factual information submitted."[100] If the agency is unable to verify within a specific time the accuracy and completeness of the information submitted, it will use BIA.[101] Similarly, Commerce will use BIA if a party refuses or is unable to provide the information requested, or if the party significantly impedes an investigation.[102] This is consistent with "the basic purpose of the statute: determining current margins as accurately as possible." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (1990). Nevertheless, the statute does not define explicitly what constitutes *best* information available.[103]

The absence of a statutory definition of BIA vests the administering agency with broad discretion. The agency's construction of BIA, therefore, must be accorded considerable deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Allied–Signal Aerospace Co. v. United States*, 996 F.2d 1185 (Fed.Cir.1993). In deciding whether to resort to any BIA, the agency must consider the cooperation shown by the parties to the investigation "to gather the data needed for an accurate determination." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed.Cir.1984). Noncooperation may warrant the agency's "use of whatever other best information it may have available." *Id.*[104] "Commerce's discretion to determine whether a respondent has complied with an information request" is consistent with "the discretion afforded Commerce in its administration of the antidumping laws." *Daido Corp. v. United States*, 893 F.Supp. 43, 49 (CIT 1995) (citing *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (1983)). The same discretion allows Commerce to request additional information from respondents before resorting to BIA.[105]

In this case, the information necessary to reach an accurate dumping determination was made available by the respondents and

**96.** AIOC Verification Report, Prop.Doc. 122 (A.R. Fiche No. 121 at 61).

**97.** Interlink Verification Report at 4, Prop.Doc. 99 (A.R. Fiche No. 120 at 11).

**98.** *Id.*

**99.** 19 U.S.C. § 1677e(b) (1988).

**100.** 19 C.F.R. § 353.36(c) (1995).

**101.** 19 C.F.R. § 353.37(a)(2) (1995). Even when the agency is not able to verify each item, the verification is supported by substantial evidence if the approach taken by the agency is reasonable and adequate under the circumstances. *See Floral Trade Council v. United States*, 17 CIT 392, 399, 822 F.Supp. 766 (1993).

**102.** 19 U.S.C. § 1677e(c) (1988). *See also* 19 C.F.R. § 353.37 (1995).

**103.** The legislative history, even though explaining that it consists of "the most up-to-date information available," does not offer further guidance. H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979).

**104.** These considerations suggested that "one may view the best information rule ... as an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest." *Atlantic Sugar*, 744 F.2d at 1560. Nevertheless, "[n]othing in the best information rule or its legislative history defines a standard of investigative thoroughness." *Id.* at 1561.

**105.** *See Hussey Copper, Ltd. v. United States*, 895 F.Supp. 311, 314 (CIT 1995).

was verified as accurate and reliable by Commerce. Commerce considered the initial inaccuracies in the data as inadvertent errors. In the end, the errors were corrected and the data were verified.[106] The low number of U.S. sales of magnesium allowed Commerce to conduct thorough and independent verifications, during which Commerce examined all the POI data, matching the data received from the producers with those received from the resellers/exporters.[107] Plaintiffs correctly point out that Commerce usually rejects untimely submissions and uses BIA instead, because "the late submission of this information [leaves] no opportunity to analyze the sales reporting and provide deficiency questions, and no opportunity for Petitioners to analyze and comment on these sales."[108] In this case, however, Commerce rendered a thorough verification, and plaintiffs were offered full opportunity to comment on the verification report.[109] Therefore, Commerce did not depart from its usual practice.

Finally, Commerce's verification does not contain any methodological problems or mathematical errors. Indeed, plaintiffs do not claim that the calculation of respondents' margins is incorrect. Plaintiffs' claim, rather, proposes a blind, punitive use of BIA, which is clearly disfavored. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed.Cir.1990). Commerce determined

that the errors contained in respondents' answers to Commerce's questionnaire "were inadvertent and were, in the end, verified;" that the margins imputed to those companies were correct; that the record was "complete and accurate."[110] Upon review of the administrative record, the Court concludes that Commerce's determination to rely on the reported information and not to resort to any BIA was neither arbitrary nor capricious, is supported by substantial evidence, and is otherwise in accordance with law.

## 7. Third-country Reseller/exporters' SG & A Expenses and Profits

■ Most of the magnesium sold to the United States was exported by trading companies located in third-country market economies. Commerce did not include these companies' SG & A expenses and profits in the calculation of the FMV of Russian magnesium.[111]

Plaintiffs claim that Commerce's exclusion of reseller/exporters' SG & A and profit amounts to a failure to include the costs of the exporter together with those of the producer, "to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise."[112] By doing so, plaintiffs aver,

**106.** *Final Determination*, 60 Fed.Reg. at 16,445.

**107.** Razno Verification Report, Prop.Doc. 97 (A.R. Fiche No. 120 at 1); Amalgamet Verification Report, Prop.Doc. 110 (A.R. Fiche No. 120 at 69); AIOC Verification Report, Prop.Doc. 122 (A.R. Fiche No. 121 at 61); Interlink Verification Report, Prop.Doc. 99 (A.R. Fiche No. 120 at 11).

**108.** Plaintiffs' Memorandum at 93 (citing *Final Determination of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products and Certain Cold–Rolled Steel Flat Products from the Nederlands*, 58 Fed.Reg. 37,199, 37,203 (1993)) and 94 (citing *Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rods from Brazil*, 58 Fed.Reg. 68,862, 68,-865 (1993)).

**109.** In response to plaintiffs' desire to comment upon the verification outline *before* verification, defendant notes that, "[g]iven that Commerce verified every U.S. sale, it is difficult to imagine how Commerce would have benefitted from plaintiffs' additional comments on the verification outline." (Defendant's Memorandum at 71.)

Indeed, plaintiffs do not claim in any of their submissions to the Court that they were not afforded the opportunity to analyze and comment on U.S. sales.

**110.** *Final Determination*, 60 Fed.Reg. at 16,445. On the other hand, Commerce agreed with petitioners that two other companies, Hochschild and Greenwich Metals, had incorrectly reported certain sales, and corrected the margins assigned to those companies accordingly. *Id.*

**111.** *Final Determination*, 60 Fed.Reg. at 16,447.

**112.** 19 U.S.C. § 1677(28) (1994). Plaintiffs explain that, even though this provision was only recently introduced as a result of the trade agreement arising from the Uruguay Round, legislative history indicates that it codifies existing practice. H.R.Doc. No. 316, 103d Cong., 2d Sess. 171 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177 ("[I]n situations where the producer and the exporter are separate companies, the Administration intends that Commerce may continue to calculate constructed value based on the total

Commerce did not compare United States price ("USP") and FMV on a fair basis, i.e., at a common point in the chain of commerce. Plaintiffs argue that USP was based on resellers' U.S. selling prices, whereas reseller/exporters' constructed value ("CV") included only the SG & A expenses and profits of the producers but not of the intermediate resellers and the final reseller/exporter.[113]

The Court observes that for nonmarket economy countries the statute mandates that the FMV of the merchandise be determined "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses, as required by subsection (e) of this section." 19 U.S.C. § 1677b(c)(1) (1988). The amount for general expenses and profit is "equal to that usually reflected in sales of merchandise ... which are made *by producers* in the country of exportation...." 19 U.S.C. § 1677b(e)(1)(B) (1988) (emphasis provided).

Thus, the statutory amount for general expenses and profit is limited to sales made by producers in the country of exportation. The statute does not mention *resellers'* sales. Therefore, the only general expenses and profit to be accounted for are those of the producers and not the resellers. The language of the statute provides an unambiguous directive for the agency and for the

court, to which the agency and the court must give effect. This result accords with the recent decision of this Court in *Rhone–Poulenc, Inc., v. United States,* 927 F.Supp. 451, 461–62 (Ct. Int'l Trade, 1996).

The statute requires a comparison between USP and FMV based on the factors of production to which general expenses, profit and the cost of containers are added. 19 U.S.C. § 1677b(c).[114] General expenses are based on the sales made by producers in the country of exportation. This is in accord with Commerce's precedent[115] and with Commerce's determination in this case.

Plaintiffs have acknowledged that a circumstance of sale adjustment "may be an appropriate mechanism for adjusting FMV to account for additional reseller costs." (Plaintiffs' Reply Brief at 45.) However, plaintiffs make no such claim. Rather, they focus on Commerce's alleged unexplained deviation from its practice by excluding resellers' SG & A from FMV.

In asserting that Commerce has an established practice to include reseller expenses in CV, plaintiffs rely on *Fresh and Chilled Atlantic Salmon from Norway,*[116] in which Commerce included the exporters' expenses in the calculation of FMV. *Salmon from Norway,* however, is distinguishable from the present case on at least two grounds: First, the producers had no selling expenses because most of their selling activities were handled by the exporters;[117] Second, the

profit and total SG & A expenses realized and incurred by both companies.").

113. *Final Determination,* 60 Fed.Reg. at 16,444–45. Thus, plaintiffs state, Commerce "erroneously compared FMV determined at the producer point to USP determined at the reseller point." (Plaintiffs' Reply Brief at 36.)

114. For market economy countries, the statute simply refers to *home market sales* values, without referring to "general expenses and profit." *See* 19 U.S.C. § 1677b(a)(1)(A).

115. *See Certain Partial–Extension Steel Drawer Slides with Rollers from the People's Republic of China,* 60 Fed.Reg. 54,472 (1995); *Final Determination of Sales at Less Than Fair Value: Coumarin from the People's Republic of China,* 59 Fed.Reg. 66,895, 66,899 (1994); *Final Determination of Sales at Less Than Fair Value: Certain*

*Paper Clips from the People's Republic of China,* 59 Fed.Reg. 51,168, 51,171 (1994); *Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China,* 59 Fed.Reg. 22,585, 22,588 (1994); *Final Determination of Sales at Less Than Fair Value: Certain Compact Ductile Iron Waterworks Fittings and Accessories Thereof from the People's Republic of China,* 58 Fed.Reg. 37,908, 37,909–10 (1993). Plaintiffs note that none of these cases involved USP based on selling prices of market-economy resellers. The issue, however, is not whether market-economy costs should be favored, but whether *resellers'* expenses should be included in the calculation of general expenses under section 1677b(e).

116. *Final Determination of Sales at Less Than Fair Value: Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed.Reg. 7,661 (1991).

117. 56 Fed.Reg. at 7,666.

FMV was based on third country sales.[118] To accurately calculate the cost of production of salmon sold by the exporters, Commerce added the exporters' SG & A to the salmon farmers' cost of production.[119] Thus, in *Salmon from Norway*, Commerce had to calculate a third-country sale value which necessarily included the exporters' SG & A. This situation, however, is different from the one that plaintiffs presented in their petition.

Plaintiffs also rely on *Tubeless Steel Disc Wheels From Brazil*,[120] which involved merchandise produced in a market economy and sold only to the United States. Since the merchandise was not sold in the home country nor to third countries, Commerce had to calculate CV, and used U.S. selling expenses as a surrogate.[121]

The Court finds that *Salmon from Norway* and *Tubeless Steel Disc Wheels From Brazil* are inapposite, and that Commerce did not depart from its practice.

Finally, no evidence points to mistakes committed by Commerce in the construction of FMV. Commerce included all costs related to the Brazilian production and sale of merchandise to the first unrelated seller in the home market.[122] Commerce's action was in accordance with the statute, which grants Commerce discretion to select the appropriate surrogate value for SG & A expenses. In the case of an NME country, Commerce usually refers to surrogate values because of the distortions to which NME costs and prices are subject. Nevertheless, Commerce *may* use prices paid by the NME country to market-economy suppliers in combination with surrogate values, when this serves the statutory purpose of "determining current margins as accurately as possible," *Rhone–Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990), and on "fair and equitable basis," *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed.Cir.1994).[123] Commerce did not deem it appropriate to deviate from the surrogate values calculated on the basis of the Brazilian information and to follow a different methodology. The Court finds that Commerce's determination is in accordance with law.

### 8. *Export Taxes and Mandatory Monetary Conversion*

Avisma and Solikamsk reported that, based on the quantity exported, their magnesium sales were subject to Russian export duties and administrative procedure fees.[124] As the exporting companies, Solikamsk and Avisma were responsible for paying these duties and fees, either in rubles or in dollars.[125] Commerce's final determination stated that "[w]e made no deduction from USP to account for exporter-incurred selling expenses, nor did we deduct export taxes paid by Russian companies to the Russian government because the actual amounts paid are an internal expense within an NME country." [126]

Commerce has requested that the Court remand Commerce's determination on Russian export taxes. Commerce has declared that the agency "is currently reevaluating its interpretation of section 772 of the Act as applied to nonmarket economies," and "the legal and policy bases for its treatment of expenses related to the USP." [127]

118. 56 Fed.Reg. at 7,662, 7,663.

119. 56 Fed.Reg. at 7,662, 7,663.

120. *Final Determination of Sales at Less Than Fair Value: Tubeless Steel Disc Wheels From Brazil*, 52 Fed.Reg. 8,947 (1987).

121. 52 Fed.Reg. at 8,948.

122. Final Calc.Memorandum, Exhibit F, Prop. Doc. 135 (A.R. Fiche No. 127 at 1).

123. *See Final Determination of Sales at Less Than Fair Value: Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed.Reg. 55,271, 55,275 (1991); *Tianjin Mach.*

*Import and Export Corp. v. United States*, 16 CIT 931, 938–41, 806 F.Supp. 1008, 1016–18 (1992); *Lasko Metal Products, Inc. v. United States*, 16 CIT 1079, 1080–82, 810 F.Supp. 314, 316–18 (1992).

124. Avisma Sections C and D Questionnaire Response, Pub.Doc. 72 (A.R. Fiche No. 14 at 1); Solikamsk Sections C and D Questionnaire Response, Pub.Doc. 73 (A.R. Fiche No. 15 at 1).

125. *Id.* Avisma and Solikamsk paid these export taxes mostly in dollars. *Id.*

126. *Final Determination*, 60 Fed.Reg. at 16,442.

127. Defendant's Memorandum at 50.

A remand is warranted to ensure a consistent approach in this and other continuing nonmarket economy proceedings. Consequently, the Court does not address the issue of the deductibility of export taxes from USP, and remands to Commerce on the question of whether the export taxes paid by an NME producer can be deducted from USP.

■ Plaintiffs' second claim is that Avisma and Solikamsk's requirement to sell half of their hard currency revenue for rubles to a Russian bank within fourteen days of receipt [128] amounts to "an implied export tax." [129] This exchange rate balancing requirement, according to plaintiffs, represents a direct cost to producers because it involves the application of a less favorable government exchange rate. Plaintiffs acknowledge that they are raising this claim for the first time here. They point out, however, that Commerce refused to make adjustments for export taxes, and that therefore it would have been futile for plaintiffs to raise this other export tax issue, the exchange rate balancing requirement.[130] Consequently, plaintiffs contend that it is appropriate to address their second claim now, together with the export taxes claim.

Defendant-intervenors insist that plaintiffs are barred from raising this claim here. The fact that plaintiffs mentioned the exchange rate balancing requirement once in a submission discussing whether or not Russia could be considered a market economy country [131] is insufficient to include this question within the broad issue of the export taxes. *See Timken*, 16 CIT 429, 436, 795 F.Supp. 438, 442–44 (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990)) (holding that it is insufficient to argue that raising broad issues implicitly raises specific issues).

Certainly, plaintiffs could have raised this claim before the agency. Plaintiffs fully discussed the export tax issue during the proceeding, but never raised or even addressed the question of the exchange rate balancing requirement. The two claims are essentially different. One constitutes an export tax, whereas the other resembles an involuntary loan made in currency. Plaintiffs have not demonstrated that the mandatory conversion requirement is included in the export taxes issue, or that the two issues are related in any way.

A plaintiff that did not exhaust its administrative remedies is estopped from raising the claim before the court. 28 U.S.C. § 2637(d) (1994). This Court would usurp the agency's function if it examined Commerce's determination upon a ground not presented before Commerce, and for which Commerce did not have an opportunity to consider the matter and to state the reason for its determination. *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946). *See also Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990). Accordingly, the Court concludes that plaintiffs' failure to raise the issue of the exchange rate balancing requirement before Commerce bars plaintiffs from raising that issue before the Court now for the first time.

## CONCLUSION

In accordance with the foregoing opinion, this case is remanded to Commerce to recalculate the surrogate value for SG & A for the Russian producers, and to consider whether the export taxes paid by an NME producer should be deducted from USP. Remand results are due within sixty days of the date this opinion is entered. Comments and responses are due within thirty days thereafter. Any rebuttal comments are due within

**128.** *See* Solikamsk Sections C and D Questionnaire Response, Attachment I at 9, Pub.Doc. 73 (A.R. Fiche No. 15 at 1); Prop.Doc. 18 (A.R. Fiche No. 79 at 1).

**129.** *Coumarin*, 59 Fed.Reg. at 66,895–96.

**130.** Plaintiffs cite *American Alloys, Inc. v. United States*, 17 CIT 8, 15, 810 F.Supp. 1294, 1299–1300 (1993); *Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 135, 583 F.Supp. 607, 609–10 (1984); *Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1575 (Fed.Cir.1990); *Cutler v. Hayes*, 818 F.2d 879, 891 (D.C.Cir.1987).

**131.** Letter from Baker & Botts L.L.P. (October 21, 1994), Pub.Doc. 143 (A.R. Fiche No. 33 at 34–35).

fifteen days after the date comments or responses are due. Plaintiffs' motion upon the agency record is denied in all other respects.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; in conformity with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration, to recalculate the surrogate value for SG & A for the Russian producers, and to consider whether the export taxes paid by an NME producer should be deducted from USP; and it is further

**ORDERED** that remand results are due within sixty (60) days of the date this order is entered; comments and responses are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days after the date comments or responses are due; and it is further

**ORDERED** that plaintiffs' motion upon the agency record is denied in all other respects.

