166 F.3d 1364
 MAGNESIUM CORPORATION OF AMERICA, The International Union of
Operating Engineers, Local 564, and United
Steelworkers of America, Local 8319,
Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee,
and
JSC Avisma Titanium-Magnesium Works, Solikamsk Magnesium
Works, Razno Alloys, Interlink Metals, Inc., and
Interlink Metals and Chemicals, S.A.,
Defendants-Appellees,
and
Gerald Metals, Inc., Greenwich Metals, Inc., and Hochschild
Partners, Defendants-Appellees,
and
AIOC Corporation and Hunter Douglas Metals, Defendants.
 No. 97-1255.
 United States Court of Appeals,
Federal Circuit.
 Jan. 22, 1999.
 
 William D. Kramer, Baker & Botts, L.L.P., Washington, DC, argued for plaintiffs-appellants. With him on the brief were Clifford E. Stevens, Jr. and Charles M. Darling, IV.
 G. Michael Harvey, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued for defendant-appellee, United States. On the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Jeffrey M. Telep, Attorney. Of counsel on the brief were Stephen J. Powell, Chief Counsel, Berniece Browne, Senior Counsel, and Robert J. Heilferty, Attorney, Office of the General Counsel, U.S. Department of Commerce, Washington, DC. Of counsel.
 John D. Greenwald, Wilmer, Cutler & Pickering, Washington, DC, argued for defendants-appellees, JSC AVISMA Titanium-Magnesium Works, et al. With him on the brief was Leonard M. Shambon. Of counsel was Stuart M. Weiser.
 Kimberly R. Young, Holland & Knight, LLP, Washington, DC, for defendants-appellees, Gerald Metals, Inc., et al. With her on the brief was Frederick P. Waite.
 Before PLAGER, SCHALL, and GAJARSA, Circuit Judges.
 GAJARSA, Circuit Judge.
 
 
 1
 Magnesium Corporation of America, the International Union of Operating Engineers, Local 564, and the United Steelworkers of America, Local 8319, (collectively "MagCorp") challenge the determination of the Department of Commerce that magnesium from the Russian Federation was not being sold at less than fair market value in the United States. See Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium From the Russian Federation, 60 Fed.Reg. 16,440 (Mar. 30, 1995) ("Final Determination"); Notice of Amended Antidumping Duty Order: Pure Magnesium From the Russian Federation; Notice of Amended Final Determination of Sales at Less Than Fair Value: Antidumping Duty Investigation of Pure Magnesium from the Russian Federation, 60 Fed.Reg. 65,635 (Dec. 20, 1995) ("Amended Final Determination"); Remand Determination: Magnesium Corp. of America, et al. v. United States, No. 94-06-00789 (Oct. 28, 1996) ("Remand Determination").
 
 
 2
 MagCorp initially appealed Commerce's Amended and Final Determinations. The Court of International Trade affirmed all but two of Commerce's determinations, remanding with respect to (1) the calculation of selling, general and administrative ("SG & A") expenses, and (2) the treatment of export taxes. See Magnesium Corp. of Am. v. United States, 938 F.Supp. 885 (Ct. Int'l Trade 1996) ("MagCorp I"). Commerce subsequently issued its "Remand Determination" addressing those two issues. MagCorp appealed the Remand Determination, challenging Commerce's refusal to deduct export taxes from the United States price where that tax is charged by a non-market economy government. The Court of International Trade affirmed. See Magnesium Corp. of Am. v. United States, 949 F.Supp. 870 (Ct. Int'l Trade 1996) ("MagCorp II").
 
 
 3
 MagCorp appeals the decision of the Court of International Trade and challenges Commerce's Final and Remand Determinations with respect to six issues: (1) electric rates, (2) export taxes, (3) SG & A expenses, (4) factory overhead costs (particularly electrolytic cell rebuild costs), (5) raw dolomite as a surrogate value for processed carnallite, and (6) by-product credits. For the reasons noted, we affirm.
 
 I.
 
 4
 On March 31, 1994, MagCorp petitioned the International Trade Administration of the United States Department of Commerce ("Commerce") alleging that magnesium from Russia was being sold in the United States at less than fair market value ("LTFV"). See MagCorp I, 938 F.Supp. at 887-88. Commerce determines if a product is sold at LTFV by comparing the United States price ("USP"), which is the purchase price in the United States, see 19 U.S.C. § 1677a(a) (1988),[1] with the foreign market value ("FMV"). See Final Determination, 60 Fed.Reg. at 16,441. If the USP is lower than the FMV, then Commerce may conclude that the product is being "dumped" on the United States market and may take appropriate action. Commerce initiated an investigation to determine if Russian magnesium, pure and alloy, was being sold or was likely to be sold at LTFV. Commerce solicited information from two Russian magnesium producers, Berezniki Titanium and Magnesium Works ("AVISMA") and Solikamsk Magnesium Works ("SMW"). See MagCorp I, 938 F.Supp. at 888.
 
 
 5
 For the purposes of this investigation, Commerce determined that Russia is a non-market economy ("NME").[2] See Final Determination, 60 Fed.Reg. at 16,443. As the Court of International Trade noted, "[t]he prices of the goods produced in an NME are subject to discrepancies which distort their value." MagCorp I, 938 F.Supp. at 890. Consequently, the costs of production in a non-market economy cannot be used to determine the FMV of any product. Although the Russian producers argued that the Russian magnesium industry is characterized by market-driven prices, and therefore Russian magnesium should be evaluated under the rules established for market economies, Commerce concluded that this industry was not a "market oriented industry." See Final Determination, 60 Fed.Reg. at 16,443. This conclusion was based, in part, on the fact that the Russian government admits continuing control of the magnesium industry through the Russian Federal Committee on Metallurgy. See id. In addition, the two Russian producers under investigation were, during the period of investigation, still partially owned by the Russian government. See id. Therefore, Russia was properly treated as a non-market economy for this investigation.
 
 
 6
 For the reasons stated above, Commerce cannot use the costs of production in Russia to determine if a product is being sold at LTFV in the United States. In such a situation, Commerce calculates the FMV according to 19 U.S.C. § 1677b(c). Under this section, the costs for the factors of production for magnesium were based on similar costs of production for a similar product from a surrogate free market country. See MagCorp I, 938 F.Supp. at 890. The surrogate country is to be "at a level of economic development comparable to that of the nonmarket economy country" and a "significant producer[ ] of comparable merchandise." See id. (quoting 19 U.S.C. § 1677b(c)(4)). In this case, Brazil was used as the surrogate for Russia because Brazil is a market economy country at a comparable level of economic development that produces a comparable product. See Notice of Preliminary Determinations of Sales at Less Than Fair Value and Postponement of Final Determinations: Pure and Alloy Magnesium From the Russian Federation, 59 Fed.Reg. 55,427, 55,430 (Nov. 7, 1994) ("Preliminary Determination").
 
 II.
 
 7
 In reviewing the judgment of the Court of International Trade, we apply the statutory standard anew to determine if Commerce's determinations are supported by substantial evidence. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed.Cir.1996). However, we " 'will not ignore the informed opinion of the Court of International Trade. That court reviewed the record in considerable detail. Its opinion deserves due respect.' " Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed.Cir.1997) (quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed.Cir.1994)). We will sustain any determination, finding, or conclusion of Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994); see Fujitsu, 88 F.3d at 1038. We address each issue presented on appeal in turn.
 
 A. Electrical Expenses
 
 8
 The production of magnesium requires a great deal of electricity, and the cost of that electricity constitutes a significant part of the cost of magnesium production. See MagCorp I, 938 F.Supp. at 892-93. Commerce stated in its Preliminary Determination that it used information reported by the United States Consulate in Belo Horizonte, Brazil. See Preliminary Determination, 59 Fed.Reg. at 55,431. However, the information provided by the Consulate was not publicly available published information ("PAPI"). See MagCorp I, 938 F.Supp. at 892-93. The use of PAPI is preferred in Commerce determinations. See id. at 894. In its Final Determination, Commerce relied on several PAPI sources that reported the electrical rates paid by Brazilian aluminum producers because aluminum production was considered as energy intensive as magnesium production. See Final Determination, 60 Fed.Reg. at 16, 446; see also MagCorp I, 938 F.Supp. at 894-95. The PAPI sources upon which Commerce relied included an American Metal Market article on the rates paid by Brazilian aluminum producers, the Tariff Bulletin published by the Brazilian Ministry of Mines and Energy showing electricity rates provided by Electrobras,[3] and the Diaro Official.[4] See id. at 893 n. 32.
 
 
 9
 MagCorp challenges the propriety of using rates paid by Brazilian aluminum producers as surrogates for rates paid by Russian magnesium producers because the Russian magnesium producers do not use enough electricity to qualify for the lowest industrial rates available to Brazilian aluminum producers. In its surrogate calculation, Commerce is required to determine the FMV of the merchandise at issue and can do so on the basis of the production costs of merchandise which is "comparable to the merchandise under investigation." 19 U.S.C. § 1677b(c)(2). Based on this section, it was reasonable for Commerce to treat both Russian magnesium producers and Brazilian aluminum producers as "large industrial users" of electricity. Indeed, MagCorp has invited the comparison between magnesium and aluminum production at other stages of this action.[5] Commerce found that the Russian magnesium producers' minimum peak usage was enough to qualify for the "large industrial user" rate paid by Brazilian aluminum producers. See Final Determination, 60 Fed.Reg. at 16,446. Although aluminum producers may actually consume more electricity, Commerce did show that the Russian magnesium producers' electricity needs crossed the threshold required for the large industrial user rate. See MagCorp I, 938 F.Supp. at 894. Thus, we reject MagCorp's challenge to Commerce's use of electric rates paid by Brazilian aluminum producers as this finding is supported by substantial evidence.
 
 
 10
 In addition to PAPI, Commerce also received information from a private firm, CSA Energy Consulting ("CSA"), on the relationship between electric rates and electricity consumption, and between electricity consumption and line tension. See MagCorp I, 938 F.Supp. at 893. MagCorp consulted CSA as well and, based on a letter from a CSA employee, requested correction of alleged ministerial errors in the Final Determination, allegations subsequently rejected by Commerce. See id.
 
 
 11
 MagCorp challenges the use of electric rate information from the CSA on the grounds that it was not PAPI and that Commerce violated MagCorp's due process rights in consulting CSA. The Court of International Trade held that Commerce did not rely on information from CSA in making its final determination. See id. at 894-95. We agree. Commerce did not rely on the CSA information in making its Final Determination because the Final Determination issued before CSA responded to Commerce's request for information. See id. at 895. Rather, Commerce relied on the PAPI described above in accordance with its preference for such PAPI.
 
 
 12
 As for MagCorp's due process challenge, although Commerce did not inform MagCorp of its request to CSA or allow MagCorp to review CSA's findings, it is clear that MagCorp was well aware of Commerce's consultation with CSA. See id. MagCorp had actual knowledge of Commerce's communication with CSA and had a full opportunity to comment on the data presented therein. See id. MagCorp was participating fully in the proceedings before Commerce, which is sufficient to overcome any constitutional challenge to the proceeding. See Timken v. United States, 699 F.Supp. 300, 309 (1988), aff'd, 894 F.2d 385 (Fed.Cir.1990). Therefore, MagCorp's due process rights were not violated.
 
 
 13
 In summary, we affirm the judgment of the Court of International Trade affirming Commerce's determination regarding electric rates.
 
 B. Export Taxes
 
 14
 As noted above, the Russian Federation is considered a NME. AVISMA and SMW reported that they paid Russian export taxes and administrative procedure fees on the magnesium that they exported during the period of investigation. Commerce did not deduct the amounts assessed as export taxes and administrative fees from the USP of the magnesium originating from these two producers. See Final Determination, 60 Fed.Reg. at 16,442. Upon MagCorp's appeal, the Court of International Trade, at Commerce's request, remanded this issue so that Commerce could reevaluate its interpretation of 19 U.S.C. § 1677a, which generally requires the deduction of export taxes from the USP. See MagCorp I, 938 F.Supp. at 905-06. In its Remand Determination, Commerce concluded that its treatment of export taxes was consistent with the language of 19 U.S.C. § 1677a and the general analysis of non-market economies. See Remand Determination, at 6-10; see also MagCorp II, 949 F.Supp. at 872-73. MagCorp challenges Commerce's conclusion because export taxes are a real cost to AVISMA and SMW, and the language of 19 U.S.C. § 1677a may require the deduction of export taxes assessed from the USP.
 
 
 15
 Resolution of this issue requires analysis of the USP provision of 19 U.S.C. § 1677a. In particular, under subsection 1677a(d)(2)(B), the USP of a product will be reduced by "the amount, if included in such price, of any export tax, duty, or other charge imposed by the country of exportation on the exportation of the merchandise to the United States." 19 U.S.C. § 1677a(d)(2)(B). MagCorp argues that 19 U.S.C. § 1677a(d)(2)(B) requires Commerce to deduct any export taxes paid from the USP of merchandise under investigation regardless of whether the tax was imposed in a market economy or a non-market economy. However, this interpretation of 19 U.S.C. § 1677a does not comport with the plain meaning of the statute.
 
 
 16
 Significantly, the statute requires export taxes to be deducted from the USP "if [the export tax is] included in such price." Because the plain language of the statute does not require all export taxes to be deducted from the USP, but requires deduction of only those that are included in the price of the merchandise, the statute clearly contemplates a situation where the export tax is not included in the price of the merchandise. MagCorp's proposed reading of the statute would give no discretion to Commerce to determine when export taxes should properly be deducted. Under MagCorp's interpretation, any export tax imposed must be deducted from the USP. However, this interpretation would impermissibly read the phrase "if included in such price" out of the statute.
 
 
 17
 We agree with the interpretation proposed by Commerce in its Remand Determination. In a market economy, Commerce can presume that any tax imposed on the merchandise to be exported will be included in the USP of that merchandise. However, that presumption is not available when the merchandise is produced in a non-market economy. By definition, in a non-market economy, the price of merchandise does not reflect its fair value because the market does not operate on market principles. See 19 U.S.C. § 1677(18) (defining non-market economy). Therefore, no reliable way exists to determine whether or not an export tax has been included in the price of a product from a non-market economy. The plain meaning of the language of subsection 1677a(d)(2)(B) supports this interpretation. Moreover, this interpretation both harmonizes subsection 1677a(d)(2)(B) (deduction of export taxes) with subsection 1677(18) (definition of non-market economy), and gives meaning to every part of subsection 1677a(d)(2)(B), including the clause "if included in such price." Statutory interpretations that give meaning to every clause of the statute are to be favored. See Heckler v. Chaney, 470 U.S. 821, 829, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (citing United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)).
 
 
 18
 Further, this interpretation based on the plain meaning of the statutory language comports with our previous treatment of real costs of production in non-market economies. In Lasko Metal Products, Inc. v. United States, we found that it was appropriate for Commerce to use certain actual costs of production when calculating a USP for a product produced in a non-market economy. See 43 F.3d 1442, 1445-46 (Fed.Cir.1994). But the costs approved in Lasko were based on "the amount the Chinese manufacturers [under examination] had actually paid on the international market for the supplies they used." Id. at 1445 (emphasis added). In that case, the costs "actually paid" by the Chinese manufacturers were costs for supplies purchased on the international market, and not intra-non-market economy expenses as in the present case. See id. at 1445-46. The costs of the factors of production for transactions inside China could not be used to calculate the USP because the available information did not permit the fair market value of those costs to be determined as China was a non-market economy. See id. at 1445.
 
 
 19
 Similarly, the nature of the Russian economy does not permit Commerce to determine whether the export taxes imposed on the exported magnesium were actually included in the price of the magnesium as required by subsection 1677a(d)(2)(B). Export taxes must be treated as an intra-non-market economy expense under these circumstances, making it impossible to determine whether the actual cost of the export tax was included in the price at which the magnesium was sold in the United States.
 
 
 20
 Therefore, we affirm the judgment of the Court of International Trade affirming Commerce's Remand Determination's treatment of export taxes.
 
 
 21
 C. Selling, General and Administrative ("SG & A") Expenses
 
 
 22
 SG & A expenses is a ratio of general expenses to the cost of manufacturing. See MagCorp I, 938 F.Supp. at 898. MagCorp alleges that Commerce's treatment of SG & A expenses was improper because the reselling costs incurred by third-country resellers were not included. As a result, argues MagCorp, Commerce did not compare the product at a similar point in the chain of commerce to the USP for the product, which did include the third-country resellers' expenses.
 
 
 23
 The Court of International Trade relied on statutory language in rejecting MagCorp's argument. See id. at 904. Subsection 1677b(e)(1)(B) requires the inclusion in the USP of
 
 
 24
 an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade.
 
 
 25
 19 U.S.C. § 1677b(e)(1)(B). This language supports Commerce's position that the "statutory amount for general expenses and profit is limited to sales made by producers in the country of exportation." MagCorp I, 938 F.Supp. at 904. On the other hand, MagCorp cites to Commerce's own Antidumping Manual to support its position that third-country reseller expenses should be included in the SG & A calculation. However, the section of the Antidumping Manual cited by MagCorp clearly refers to merchandise exported from market economies. See International Trade Admin., U.S. Dep't of Commerce, Antidumping Manual: Import Administration 52 (1994). Because MagCorp's position is not supported by the language of the statute or by Commerce's Antidumping Manual, we affirm the judgment of the Court of International Trade affirming Commerce's determination on the issue of SG & A expenses.
 
 D. Factory Overhead
 
 26
 In calculating the proper amount of factory overhead, Commerce relied on information obtained during an antidumping investigation of a Brazilian silicomanganese producer. See MagCorp I, 938 F.Supp. at 896. MagCorp argues that Commerce improperly excluded the extra expenses regularly incurred for electrolytic cell rebuilds in Russian magnesium factories which are not regularly incurred in Brazilian silicomanganese factories. The Brazilian manufacturers do not incur cell rebuild costs because they use silicomanganese furnaces, which, according to MagCorp, require less repair. MagCorp couches this as a factual challenge under the "substantial evidence" standard. However, this is a legal issue, not a factual one.
 
 
 27
 Factory overhead is composed of many elements, and 19 U.S.C. § 1677b(c)(4) gives Commerce broad discretion in valuing the factors of production on which factory overhead is based. Nothing in the statute requires Commerce to value each individual element in the non-market economy. As the Court of International Trade noted, Commerce is not required to do an item-by-item analysis in calculating factory overhead. See id. at 897. Rather, Commerce followed the requirements of the statute by relying on publicly available information of factory overhead costs of a Brazilian silicomanganese producer. As factory overhead is composed of many different elements, the cost for individual items may depend largely on the accounting method used by the particular factory. See id. Given these uncertainties, the broad statutory mandate directing Commerce to use, "to the extent possible," the prices or costs of factors of production in a comparable market economy country does not require item-by-item accounting for factory overhead. For this reason, MagCorp's challenge to Commerce's use of Brazilian silicomanganese producer information fails. Therefore, we affirm the judgment of the Court of International Trade affirming Commerce's determination regarding factory overhead costs.
 
 E. By-Product Credits
 
 28
 Chlorine and potassium chloride are produced as a result of the magnesium production process, and AVISMA and SMW use or sell portions of these by-products. See id. at 899. Based on these facts, Commerce reduced the cost of manufacture of the Russian magnesium accordingly. See id. MagCorp argues that Commerce overstated the value of these credits because it deducted the value of the by-products after processing without properly accounting for the by-product processing costs. MagCorp argues that the cost of processing, marketing, distributing and selling the by-products should be deducted from the by-product credits. However, as the Court of International Trade noted, Commerce allocated the by-product costs to factory overhead, eliminating the need to account for these costs separately. See id. at 900. We agree with the Court of International Trade that Commerce's treatment of by-product costs as part of factory overhead is a reasonable interpretation of 19 U.S.C. § 1677b(c). As the discussion of factory overhead in the previous section points out, factory overhead encompasses many different factors and does not require an item-by-item accounting.
 
 
 29
 Further, MagCorp argues that AVISMA has already received credit for a portion of its by-products in another investigation. As no evidence exists to support this allegation, it was properly rejected by Commerce. Therefore, we affirm the judgment of the Court of International Trade affirming Commerce's determination regarding by-product credits.
 
 
 30
 F. Surrogate Values for Concentrated Carnallite
 
 
 31
 In calculating a surrogate price for Russian magnesium, Commerce used unprocessed, raw dolomite as a surrogate for the processed, concentrated carnallite used in magnesium production. See Final Determination, 60 Fed.Reg. at 16,449. Commerce used raw dolomite as the most appropriate surrogate for concentrated carnallite because these materials have a similar magnesium chloride content and a price for concentrated carnallite was not available in Brazil. See id. MagCorp does not challenge that raw dolomite is an appropriate substitute for raw carnallite, but does argue that the comparison to concentrated carnallite is inappropriate because it does not account for the cost incurred by Russian magnesium producers to process raw carnallite into concentrated carnallite.
 
 
 32
 The Court of International Trade rejected MagCorp's argument based on the language of 19 U.S.C. § 1677b(c)(2). See MagCorp I, 938 F.Supp. at 891-92. As noted above in the discussion of electric rates, this subsection requires Commerce to use the value of merchandise which is comparable to merchandise under investigation. Raw dolomite is comparable to processed carnallite for these purposes because both substances have similar magnesium levels. Moreover, whatever costs incurred in processing raw dolomite into a suitable form for magnesium production were included in the factory overhead for the Brazilian industry. Therefore, we affirm the judgment of the Court of International Trade affirming Commerce's determination regarding surrogate values for concentrated carnallite.
 
 III.
 
 33
 For the reasons given above, the judgment of the Court of International Trade affirming Commerce's Final and Remand Determinations is
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 The investigation in this case was initiated before January 1, 1995, the effective date of the amendments to the antidumping statutes by the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994). Accordingly, all citations to the United States Code are to the 1988 edition, unless otherwise noted. See Aimcor v. United States, 141 F.3d 1098, 1100 n. 2 (Fed.Cir.1998)
 
 
 [2]
 Non-market economy is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)
 
 
 [3]
 Electrobras is Brazil's central distributor of electricity
 
 
 [4]
 The Diaro Official fills a role similar to that played by the Federal Register in the United States
 
 
 [5]
 In MagCorp's Factor Submission, Pub. Doc. 264 at 2, (A.R. Fiche No. 55 at 2), which included MagCorp's expert witness statement, MagCorp asserted that the aluminum industry is the most comparable to the magnesium industry in terms of production processes and costs. See MagCorp I, 938 F.Supp. at 894 n. 44